# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

MICHAEL L. McGINLEY, ET AL.  CASE NO. 3:17-CV-00821

VERSUS  JUDGE TERRY A. DOUGHTY

LUV N' CARE, LTD., ET AL.  MAG. JUDGE KAREN L. HAYES

## MEMORANDUM OPINION AND ORDER ON CLAIM CONSTRUCTION

On April 3, 2019, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 8,636,178 ("the '178 Patent"). Having considered the arguments made by the parties at the hearing and in the parties' briefing[1], having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] The parties' arguments relating to the claim construction disputes are included in their respective motions for summary judgment for infringement and noninfringement. [Doc. Nos. 136, 143, 170, 137, 157, & 168]. Given that the accused device was discussed in detail in these motions, the Court was careful and cognizant to construe the claims "in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (emphasis in original). For example, the Court required the parties to argue all claim construction issues first and separate from their respective motions for summary judgment at the April 3, 2019 Hearing. The Federal Circuit has indicated that there is nothing procedurally incorrect with how the parties' briefed the issues in this case, and that "[w]hile a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326 (Fed. Cir. 2006).

## I. BACKGROUND

The '178 Patent was filed on October 22, 2008, issued on January 28, 2014, and is directed to a container or pitcher "having a flexible side wall portion and rim portion . . . which can conform to the shape of an object." '178 Patent at Abstract. The specification indicates that the primary purpose of the container is for rinsing shampoo or soap from the head of a child. *Id.* at 2:57–63. Figures 3 and 6 illustrate different embodiments of the container with and without divider 40.



*Id.* at Figs. 3 & 6. The specification states that the container has continuous sidewalls (12) with one of the sidewalls having a sidewall portion (24) with a flexible panel portion (28). *Id.* at 4:4–61. The specification further states that the flexible panel portion is constructed of a thin flexible plastic or a flexible rubber panel that is capable of conforming to the shape of the head of a child. *Id.* at 4:43–61. In operation, the flexible panel portion is pressed against the front of the head above the eyes and the rinse water pours over the top of the head. *Id.* at 2:57–63. The specification indicates that the flexible panel portion prevents the rinse water from flowing into the child's eyes or face. *Id.*

As illustrated above, the specification discloses embodiments of the container without a

divider (Figure 3) and with a divider (Figure 6). *Id.* at 3:29–34, 3:42–46, Figs. 3 & 6. The specification states that the divider is provided so that the rinse water flows over the head more evenly. *Id.* at 7:11–18. Figure 9 illustrates an embodiment having a sidewall section that is shown to be flat with a flat flexible panel (28) flexed slightly inward.



Fig. 9

*Id.* at Fig. 9. As illustrated in Figure 9, this embodiment also includes "a generally curved divider panel (50) which separates container (10) into two fluid holding compartments." *Id.* at 6:58–59. The specification discloses that "that the curvature of panel (50) thereby directs the fluid contained in second compartment (44) generally onto the center of the head of the child and avoids even distribution of the water across the width of curved divider panel (50) as the water is being poured out of second compartment (44)." *Id.* at 7:6–12.

Claim 1 of the '178 Patent recite the following elements (disputed term in italics):

> 1. A container *comprising*:
>
>> a generally continuous sidewall terminating in an upper sidewall end and a lower sidewall end and defining an inward fluid holding space bounded by said continuous sidewall, said continuous sidewall having a flexible portion thereof that defines *a generally flat sidewall section* and a

generally non flexible portion joined on either end to the flexible portion, a bottom closing said lower sidewall end with said upper sidewall generally flat sidewall section end being generally open,

a *generally flat inwardly flexible panel* forming a portion of said *generally flat sidewall section* and extending to form at least a portion of said upper sidewall end, the flexible panel facing outwardly and being sized, shaped and sufficiently pliable to matingly mold to the head of a person during use; said flexible panel having a generally smooth inward surface for unobstructed fluid flow out of said open upper sidewall end, and

a *handle located on* the non flexible portion opposite the flexible panel to allow a user to lift and pour the container when filled with liquid.

## II.    APPLICABLE LAW

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips,* 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed.

Cir. 2014), *vacated on other grounds* 135 S.Ct. 1846 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.")

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if

it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### B.  Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal.").  The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

"To act as his own lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renshaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renshaw*, 158 F.3d at 1249.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary

skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Plaintiffs suggest that the level of ordinary skill in the art is "that level of skill possessed by an ordinary individual having at least a high school education or the equivalent, with knowledge and experience of household and consumer goods like the rinse cup products at issue and familiarity with plastic, rubber, foam and other flexible materials as of February 2003. The level of ordinary skill does not require any 'formal' education or licensure as an engineer or design professional, or a degree in mechanical engineering or product or mechanical design." [Doc. No. 218 at 1].[3]

Defendants contend that "a person of ordinary skill and a person of skill in that art would be a person with either (1) a mechanical engineering or design degree and two years actual product experience or (2) a person with no formal degree who had at least five years of practical experience in mechanical or product design of consumer products." [Doc. No. 223 at 1].

---

[3] Citations to the parties' filings are to the filing's number in the docket (Doc. No.) and pin cites are to the page numbers assigned through ECF.

Having considered the parties' proposals, and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have either: (1) a Bachelor's degree in Mechanical Engineering or equivalent thereof, and at least two years of experience designing consumer products, or (2) familiarity with plastic, rubber, foam and other flexible materials, and at least five years of experience designing consumer products.

## IV.   CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of five terms/phrases of the '178 Patent.

### 1.  "comprising"

| Disputed Term | Plaintiffs' Proposal[4] | Defendants' Proposal[5] |
|---|---|---|
| "comprising" | "including but not limited to" | No construction provided by Defendants |

### a)  The Parties' Positions

Plaintiffs argue that the word "comprising" as used in the claims means "including but not limited to." [Doc. No. 136-33 at 24-25] (citing *McGinley v. Munchkin, Inc.*, No. 09-257, 2010 WL 128053 (W.D. Mo., Apr. 2, 2010); *In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009)). According to Plaintiffs, "comprising" simply means that a device "may contain elements in addition to those explicitly mentioned in the claim." [*Id.* at 25].  Defendants do not provide any arguments related to the term "comprising," or provide a proposed construction. [Doc. No. 223 at 2].

---

[4] Doc. No. 224 at 1.
[5] Doc. No. 223 at 2.

### b) Analysis

A patent claim has three major sections: (1) a preamble; (2) a transitional phrase; and (3) a body. Transitional phrases, such as "comprising," "consisting of," and "consisting essentially of," are terms of art in patent law that "define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim." MANUAL OF PATENT EXAMINING PROCEDURE § 2111.03. Here, the claims use the transitional phrase "comprising." *See, e.g.*, '178 Patent at 8:23 (Claim 1: "A container comprising:"), 8:52 (Claim 6: "A container comprising:").

It is well established that the transitional phrase "comprising," is inclusive or open-ended and does not exclude additional, unrecited elements or method steps. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Specifically, "[i]n the patent claim context the term 'comprising' is well understood to mean 'including but not limited to.'" *CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). Accordingly, the Court finds that the term "comprising" should be construed to mean "including but not limited to."

### c) Court's Construction

The Court construes the term **"comprising"** to mean **"including but not limited to."**

### 2. "generally flat sidewall section" and "generally flat inwardly flexible panel

| Disputed Term | Plaintiffs' Proposal[6] | Defendants' Proposal[7] |
|---|---|---|
| "generally flat" | "generally flat" as used in claims 1 and 6 in regard to a "sidewall section" means "a sidewall section that need not be exactly or perfectly flat, but is mostly flat."<br><br>"generally flat" as used in claim 1 in regard to an "inwardly flexible panel" means "an inwardly flexible panel that need not be exactly or perfectly flat, but is mostly flat." | "mostly flat and not curved" |

#### a) The Parties' Positions

The parties agree that the term "generally flat" means that the sidewall section is not required to be perfectly flat. *See, e.g.*, [Doc. No. 168 at 11 ("Generally flat" is not perfectly flat . . . .")].  The parties dispute whether "generally flat" means that the sidewall section "cannot be curved, cylindrical or rounded," as Defendants propose. *Id.*  Plaintiffs argue that the use of the term "generally flat" reveals that the sidewall and/or panel recited in the claims includes a mostly smooth and even surface, which may have some curvature, arc, bend or bow. [Doc. No. 136-33 at 25].  Plaintiffs contend that their construction is reasonable and consistent with the plain and ordinary meaning of the term. [*Id.*] (citing Merriam-Webster.com, Google online dictionary).  Plaintiffs further argue that their construction is also consistent with the ordinary and common use of the word "flat," because the word "flat" ordinarily allows for some deviation from "perfectly flat." [*Id.* at 26.]  Plaintiffs contend that the surface of a "flat" highway or road typically includes a crown to allow for drainage. [*Id.*]

---

[6] Doc. No. 224 at 1.
[7] Doc. No. 223 at 2.

Plaintiffs further argue that the specification does not describe the flexible panel as being "flat," but instead contemplates a measurable amount of curvature or bowing. *Id.* (citing '178 Patent at 1:14–16, 2:50–55, 3:30–34, 5:3–14, 7:18–22). Plaintiffs contend that the flexible panel may have a curvature or bow to ensure that the panel will "effectively seal off [the] passage of fluids back under the flexible rim" while allowing a broad flow of water. *Id.* (citing '178 Patent at 2:57–60, 4:63–5:14). Plaintiffs argue that the specification describes the rim of the flexible panel as being "generally flat," which they contend confirms that the term does not require a construction meaning "straight" or "without a curve." *Id.* (citing '178 Patent at 4:30–38).

Plaintiffs also argue that the drawings reveal some curvature in the flexible panel (28), even when the flexible panel is not shown as being pressed against an object. *Id.* at 27 (citing '178 Patent at Figures 1, 2, 7 and 9). According to Plaintiffs, the drawings show that a flexible panel with some curvature, arc, bend or bow is "generally flat." *Id.* Finally, Plaintiffs argue that the Court may consider that the inventor's testimony regarding the proper construction for these terms. *Id.* (citing Doc. No. 136-2 at ¶41; Doc. No. 136-28).

Defendants respond that the plain and ordinary meaning of the words "generally" and "flat" cannot be construed to include a curved surface with no flat sections. [Doc. No. 143 at 11]. First, Defendants argue that Plaintiffs provide no basis for deviating from the ordinary meanings. *Id.* (citing Doc. No. 143-22). While Plaintiffs rely on web-based dictionaries, there is no evidence that these dictionaries or their content was available at the time the '178 Application was filed on October 22, 2008. *Id.* at 12. Additionally, Plaintiffs cannot rely on inventor testimony. *Id.* (citing *Intellicall, Inc. v. Phonometrics, Inc*., 952 F.2d 1384, 1388 (Fed. Cir. 1992)).

Instead, Defendants contend that the flexible panel pitcher shown in Figure 9 illustrates a flat sidewall and a flat flexible panel forming a portion of that sidewall. *Id.* According to

Defendants, the flat sidewall and the flat flexible panel of Figure 9 are unlike the container shown in the previously filed drawings, Figures 1 through 6. *Id.* at 13. Defendants contend that the containers of the Figures 1 through 6 are cylinders with curved sidewalls and do not have flat sections. *Id.* Defendants further contend that the flexible panels shown in Figures 1-6 follow the curvature of the cylindrical containers and do not form a portion of any non-existent flat section.

In further support, Defendants argue that the "generally flat" limitations were introduced into the claims by the patentee in response to a double patenting rejection. *Id.* at 15. At the time of the double patenting rejection, claims 32 and 33 did not include the "generally flat" limitations. *Id.* Therefore, in response, the patentee cancelled claims 32 and 33 and submitted new claims 34 and 35, which became claims 1 and 6 respectively in the '178 Patent. *Id.* (citing Doc. No. 143-5 at 86). Defendants argue that the patentee not only offered the "generally flat" limitations to overcome the double patenting rejection but specifically stated that the "generally flat" limitations offered distinct advantages over his prior cylindrical or curved embodiments. *Id.* at 16 (citing Doc. No. 143-5 at 86). Thus, according to Defendants, the patentee clearly expressed the intent that the "generally flat" limitations were added to avoid reading on a curved sidewall and flexible panel. *Id.*

Defendants also point out that the patentee went on to expressly distinguish his new claims from the prior art. *Id.* (citing Doc. No. 143-5 at 87-88). According to Defendants, the identified prior art (Fitts, Sexton, Tupper, Gold, Seki, Martinez, Propes, Drake-Tipton, Bergman, and Scholl) all show cylindrical containers with curved sidewalls very much like the sidewalls of the containers illustrated in Figures 1-6 of the '675 and '178 Patents. *Id.* at 17. Defendants contend that the Patent Office continued to object to the application, and on May 14, 2010 issued a Final Rejection. *Id.* at 18. In response to this Final Rejection, the patentee submitted a Request for

Reconsideration that emphasized the "generally flat" limitations to overcome the Final Rejection. *Id.* (citing Doc. No. 143-5 at 113-119). When the Patent Office rejected the patentee's argument in his Request for Reconsideration, the patentee filed an Appeal Brief before the USPTO Board of Patent Appeals and Interferences. *Id.* (citing Doc. No. 143-5 at 128-146). In that brief, the patentee argued that the prior art did not disclose the claimed flat side wall section of claims 34 and 35 and did not teach the generally flat inwardly flexible panel recited in claim 34. *Id.* at 18-19 (citing Doc. No. 143-5 at 137-138). The examiner reopened prosecution and issued a new rejection on the basis of the Glintz Patent. *Id.* at 19.

The patentee failed to respond in a timely manner, and the application was abandoned on June 22, 2011. *Id.* (citing Doc. No. 143-5 at 162-163). Defendants contend that, in the patentee's request for reconsideration, he relied expressly on the "generally flat" limitations to overcome the prior art. *Id.* (citing Doc. No. 143-5 at 175). Defendants argue that the PTO continued to reject the claims on the basis of the Glintz Patent and made the rejection Final. *Id.* (citing Doc. No. 143-5 at 187).

In response to the Final Rejection, the patentee amended the claims and added a requirement for a handle. *Id.* (citing Doc. No. 143-5 at 198, 199). Defendants argue that the patentee once again emphasized "a flat outer surface" to distinguish the claims from the Glintz Patent. *Id.* (citing Doc. No. 143-5 at 209). Defendants contend that the claim amendments and arguments were found to be persuasive, and a Notice of Allowance was issued on September 30, 2013. *Id.* at 20. Defendants argue that Plaintiffs cannot ignore the "generally flat" limitations and the "handle" limitations given that the patentee amended his claims to add these limitations, and then argued repeatedly that these limitations distinguished the claims from the prior art. *Id.* According to Defendants, the intrinsic evidence supports a construction that "generally flat"

cannot read on a curved container with no flat surfaces. *Id.*

Regarding Plaintiffs' construction, Defendants argue that Plaintiffs attempt to ignore the "generally flat" sidewall limitation in the claims, suggesting that the container is not limited to any particular shape. *Id.* Defendants contend that this would read the "generally flat sidewall section" limitation out of the claims. *Id.* at 21. Defendants also argue that Plaintiffs fail to discuss Figures 7 to 9, or inform the Court that they were added to the application that became the '178 Patent. *Id.* Defendants contend that Figure 9 illustrates a "generally flat sidewall section," "a generally flat inwardly flexible panel forming a portion of said generally flat sidewall section" and "an inwardly flexible and pliable panel forming a portion of said generally flat sidewall section." *Id.* According to Defendants, these claim limitations describe exactly what was added in the continuation-in-part. *Id.* Therefore, the '178 Patent prosecution history confirms that "generally flat" cannot be defined as Plaintiffs propose when this limitation was necessary to overcome statutory double patenting claims. [Doc. No. 168 at 9].

Defendants also argue that nothing in the dictionary definitions of "flat" that Plaintiffs rely upon says anything about curvature. *Id.* at 10. Defendants contend that Plaintiffs fail to recognize that the '178 Patent specification also uses the terms "generally circular." *Id.* (citing '178 Patent at 4:30–38). Defendants argue that using both the terms "generally curved" and "generally flat" in the '178 Patent specification means that the terms must describe different features. *Id.* at 11. Defendants contend that if Plaintiffs construe "generally flat" as referring "to a surface that may or may not be curved, as opposed to perfectly flat or straight," then this definition is synonymous with "generally curved." *Id.*

Moreover, Defendants argue that the adverb "generally" must be applied in context with the use of "flat" or "curved," and the definitions should not bleed into one another. *Id.* In contrast

to Plaintiff's construction, Defendants argue that their construction gives credence to the use of "generally" consistent with both "flat" and "curved." *Id.* While "generally flat" is not perfectly flat, they argue that it cannot be curved, cylindrical or rounded, and "generally curved" would not be perfectly curved but cannot be flat. *Id.*

Finally, Defendants argue that construction for the term "generally flat" has been addressed by other courts, including the Federal Circuit. [Doc. No. 137-1 at 17] (citing *Schoell v. Regal Marine Indus.*, 247 F.3d 1202 (Fed. Cir. 2001)). The patentee in *Schoell* amended the claims to add the "generally flat" limitation to avoid a double patenting rejection. *Id.* Based on that amendment, the patentee in *Schoell* could not later argue that a V-shaped hull was "generally flat." *Id.*

In this case, the Patent Office rejected the patentee's new application based on his prior '675 Patent. [Doc. No. 168 at 12]. Defendants contend that the patentee submitted new claims adding the "generally flat" limitations, and argued that the "generally flat" limitations distinguished the new claims from the '675 Patent, as well as numerous other prior patents all showing containers with curved sidewalls. *Id.* at 13. According to Defendants, the patentee's arguments to the Patent Office exclude a curved sidewall and curved flexible panel from the claims. *Id.*

Plaintiffs reply that a surface that is not "perfectly flat" may possess some degree of curvature, arc, bend, or bow. [Doc. No. 170 at 5] (citing Doc. No. 170-16). Plaintiffs contend that a surface that is not "perfectly flat" can be regarded as being "mostly" or "generally flat," so long as the deviation from "perfect flatness" or "straightness" arising from the degree of any curvature does not result in the surface becoming "mostly curved" instead of "mostly" or "generally flat." *Id.*

Plaintiffs next reply that the shape of the containers depicted in Figures 1-6 are not uniformly cylindrical or round. *Id.* at 7 (citing '178 Patent). Instead, the figures disclose a container having a sidewall section on the front or face of the device, which is mostly or generally flat and smooth. *Id.* (citing Doc. No. 170-17). Plaintiffs contend that Figures 1-4 all show the container having continuous sidewall that is curved and rounded at the back and on the sides, but which is definitively less curved and less rounded at the front. *Id.* at 7-8. Plaintiffs contend that the degree of curvature or the arc of the continuous sidewall depicted in Figures 1-4 is dramatically reduced at the front of the containers, opposite the handle, and is mostly or "generally flat." *Id.* at 8.

Plaintiffs next reply that Figures 5 and 6 show a container with a continuous sidewall with a "generally flat" section at the front. *Id.* Plaintiffs contend that the sidewall sections on the containers depicted in Figures 5-6 are the same as Figures 3-4, with a divider added, and that none of the depicted containers "follow[s] the curvature" of the remaining portion of the sidewall, but instead form a portion of a "generally flat" sidewall section. *Id.* According to Plaintiffs, the specification expressly contemplates a measurable amount of curvature or bow needed for the flexible panel to "matingly mold" and conform to the shape of the object it is pressed against when used (*e.g.*, a child's forehead). *Id.* at 9 (citing '178 Patent at 1:14–1:16, 2:50–55, 2:57–63, 3:30–34, 4:62–5:14, 5:3–14, 7:18–22).

Regarding the prosecution history, Plaintiffs contend that Defendants cannot show that the patentee ever knowingly and affirmatively agreed that the term "generally flat" should be limited to "perfectly flat." *Id.* Plaintiffs argue that Defendants fail to fully explain the remarks that the patentee made in support of the amendments that added the "generally flat" limitations to the claims. *Id.* (citing Doc. No. 143-5 at 82). Plaintiffs further argue that the patentee did not add the

"generally flat" flexible panel and sidewall section limitation to the application in order to overcome any prior art "round" or "cylindrical" references. *Id.* (citing Doc. No. 143-5 at 86).

Plaintiffs contend that the decision of the Patent Office to allow the term "generally flat" to remain in the claims dispels any notion that the patentee deliberately added the limitation to avoid reading on any sidewall section or flexible panel portion of the sidewall having any sort of curve. *Id.* at 11. According to Plaintiffs, none of the remarks that the patentee made to distinguish the asserted "prior art" were made to distinguish any sidewall section or panel portion because it was in any way curved, bowed or bent. *Id.* Plaintiffs contend that the continued presence of the term "generally flat," instead of "flat," conclusively refutes Defendants' arguments. *Id.*

Plaintiffs further argue that Defendants have not meet their burden of proving the existence of a "clear and unmistakable" disclaimer. [Doc. No. 157 at 17-18]. Nothing in the prosecution history indicates that the patentee used and construed the term "generally flat" at any point as meaning anything other than what "generally flat" ordinarily means. *Id.* at 18. According to Plaintiffs, the statements in the prosecution history reflect that "generally flat" was used and construed throughout to mean a surface that was "generally" or "mostly" "flat." *Id.* Plaintiffs argue that none of the remarks made to distinguish the examiner's rejections based on any "prior art round pitchers" indicate any concession that "generally flat" was being added to or used in the claims to exclude a surface having any sort of curvature, arc, bend or bow. *Id.*

Plaintiffs further argue "that the ordinary meaning of 'generally flat' means 'mostly' flat and therefore allows for a surface that, although may not be perfectly 'round' or curved, can comprise a shallow or slight curvature, arc, bend or bow. . ." *Id.* at 19. Plaintiffs contend that the prosecution history at most establishes that the patentee was able to convincingly distinguish all of the submitted prior art on the grounds that the references did not teach or suggest his invention.

*Id.* at 20. Plaintiffs further contend that the patentee distinguished his flexible panel pitcher invention from a selected set of "prior art pitchers" that were admittedly round, or had a surface, or multiple corners, or other features that rendered the subject surface of each cited reference as being something other than "generally flat." *Id.* According to Plaintiffs, the distinguished features were round or mostly round or circular or corrugated and uneven. *Id.*

Plaintiffs also argue that the patentee did not add the "generally flat sidewall section" language to the claims to overcome a "double patenting" rejection based on the "roundness" of the '675 Patent. *Id.* at 20-21. Plaintiffs argue that the '675 Patent claims are not limited to a "round" container. *Id.* at 21. Plaintiffs contend that the only reason for adding the language was to "avoid[] the 'same invention' type double patenting identified by the Examiner." *Id.*

Finally, Plaintiffs argue that the facts and situation in *Schoell* are "decidedly different." [Doc. No. 170 at 12]. Plaintiffs contend that the patentee did not concede that "mostly flat" meant "perfectly flat and without any curve, arc bend or bow." *Id.* Plaintiffs argue that the patentee plainly intended and described the term to mean "mostly" and perhaps not all the way "perfectly" flat or "perfectly" straight. [Doc. No. 157 at 22]. Plaintiffs further argue that the patentee added the "generally flat" limitation to the proffered claim to differentiate the claims from those of his prior '675 Patent. *Id.* Plaintiffs contend that the patentee did not expressly distinguish the "generally flat" features from those found on the accused device. [Doc. No. 170 at 12].

**b) Analysis**

As an initial matter, the Court finds that, to properly resolve the parties' claim construction dispute, the Court should construe more than the term "generally flat." The Court notes that the term "generally flat" is used to further qualify two other elements in the claim. Specifically, claims 1 and 6 recite a "generally flat sidewall section," and claim 1 recites a "generally flat inwardly

flexible panel."  Therefore, to avoid potential confusion, the Court finds that the terms "generally flat sidewall section" and "generally flat inwardly flexible panel" should be construed.  Indeed, Plaintiffs propose different constructions for the term "generally flat" based on the surrounding claim language identified by the Court. [Doc. No. 224 at 1].  Accordingly, the Court will construe the terms "generally flat sidewall section" and "generally flat inwardly flexible panel."

### i.    Claims and Specification

To begin the analysis, the Court first turns to the language of the claims, as it provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1313 (citing *Vitronics Corp.*, 90 F.3d at 1582).  The term "generally flat sidewall section" appears in claims 1 and 6 of the '178 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim.  The term "generally flat inwardly flexible panel" appears in claim 1 of the '178 Patent.

Claims 1 and 6 recite a generally continuous sidewall having a flexible portion and a non-flexible portion.  The claims further indicate that the flexible portion includes "a generally flat sidewall section."  Claim 1 also recites that the "generally flat inwardly flexible panel" is a portion of the "generally flat sidewall section."  Thus, the plain language of the claim indicates that the flat sidewall section and flat inwardly flexible panel are distinct and different from the remainder of the continuous sidewall.  Moreover, the "generally flat" modifier further indicates that one of the differences between these sections and the remainder of the continuous sidewall is their shape.  Indeed, the specification states that "[s]ide wall rim 20, in a preferred embodiment is comprised of side wall portion 24, which is a generally flat portion of side wall rim 20, and which may, therefore, *differ, generally, in its shape as compared to the remainder of side wall rim 12 and side wall 20.*" '178 Patent at 4:30–34 (emphasis added).  The specification further states that "if side wall 12, in its construction, comprises a cylindrical container, then side wall rim 20 will be

comprised of a generally circular side wall rim portion 26 and a generally flat side wall rim portion or side wall segment or rim segment 24." *Id.* at 4:34–38. For example, Figure 2 illustrates a generally flat side wall portion (24) that differs in its shape as compared to the remainder of the continuous sidewall (12).



*Id.* at Figure 2. Likewise, Figure 4 illustrates a generally flat side wall portion (24) that differs in its shape as compared to the remainder of the continuous sidewall.



Fig. 4.

*Id.* at Figure 4. Both Figures 2 and 4 further illustrate, and the parties agree, that the "generally flat" sidewall section is not perfectly flat. *See, e.g.*, Doc. No. 168 at 11 ("'Generally flat' is not perfectly flat . . . ."). Thus, the idea that the sidewall section is not perfectly flat gives meaning to the adverb "generally."

### ii. Prosecution History of the '178 Patent

The prosecution history of the '178 Patent further confirms that "generally flat sidewall section" means "a section of the sidewall that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall." Specifically, the USPTO issued a double patenting rejection noting that the '178 Application claims were the same as the '675 Patent. [Doc. No. 143-5 at 82]. The patentee did not dispute the rejection, but instead amended the claims to add the "generally flat" limitations to avoid the double patenting rejection, as well to overcome identified prior art that showed mostly rounded or circular containers. *Id.* at 86. In the earlier '675 Application, the patentee added a "divider" limitation that was not shown in the prior art round container to overcome the USPTO rejection. [Doc. No. 136-22 at 115]. However, the patentee dropped the "divider" limitation and added the "generally flat" limitations in the '178 Application.

[Doc. No. 143-5 at 51].

The patentee went on to state that the "flat sidewall section that is flexible is a limitation [that] is not present in the claims of U.S. Patent No. 7,441,675." [*Id.* at 86]. The patentee also argued that the specific advantages of the flat sidewall is that "it avoids the obstruction presented by the nose of the person against whom the device is being applied." *Id.* Thus, the Court finds that the patentee not only offered the "generally flat" limitations to overcome the double patenting rejection, but also indicated that the different shape of the sidewall as compared to the remainder of the continuous sidewall offered "specific advantages."

The patentee also expressly stated that the added limitation of "generally flat" was not found in the identified prior art round pitchers. *Id.* at 86-88. During the prosecution of his prior applications, the USPTO had identified a number of prior art patents, and each of these prior art patents were included in the '178 Application. Most of these prior art patents disclose cylindrical or round containers. In his response to the double patenting rejection, the patent included arguments addressing these prior art patents including those patents to Fitts, U.S. Patent No. 33,737 [Doc. No. 143-8]; Sexton, U.S. Patent No. 1,225,511 [Doc. No. 143-9]; Tupper, U.S. Patent No. 2,610,490 [Doc. No. 143-10]; Gold, U.S. Patent No. 3,729,553 [Doc. No. 143-11]; Seki, U.S. Patent No. 4,609,113 [Doc. No. 143-12]; Martinez, U.S. Patent No. 4,886,206 [Doc. No. 143-13]; Propes, U.S. Patent No. 4,955,503 [Doc. No. 143-14]; Drake-Tipton, U.S. Patent No. 5,415,305 [Doc. No. 143-15]; Bergman, U.S. Patent No. 6,708,838 [Doc. No. 143-16]; Scholl, U.S. Patent No. RE35,933 [Doc. No. 143-17]; Perock, U.S. Patent No. 4,756,439 [Doc. No. 143-18]; and Bertone, U.S. Patent No. 5,507,431 [Doc. No. 143-19].

With respect to the Fitts and Sexton Patents, [Doc. Nos. 143-8, 143-9], the patentee stated that the "present invention is distinguished as the present invention claims a generally rigid

continuous sidewall having a portion thereof that defines a generally flat sidewall section. These references do not teach or suggest either of these limitations." [Doc. No. 143-5 at 87]. With respect to the Tupper, Gold, Seki, Martinez, Propes, Drake-Tipton, Bergman, and Scholl Patents [Doc. Nos. 143-10 – 143-17], the patentee stated that the "present invention recites a generally rigid continuous sidewall having a generally flat sidewall section and an inwardly flexible panel within the generally flat sidewall section. These references do not teach or suggest either of these limitations." [Doc. No. 143-5 at 87]. As shown below, all of these prior art patents show cylindrical containers with curved sidewalls very much like the sidewalls of the containers illustrated in Figures 1-6 of the '675 and '178 Patents.





USPN 4,609,113 Seki (Ex. 254)     USPN 4,886,206 Martinez (Ex. 255)

USPN 4,955,503 Propes (Ex. 256)     USPN 5,415,305 Drake-Tipton (Ex. 257)



FIG.1

USPN 6,708,838 Bergman (Ex. 258)

USPN RE35,933 Scholl (Ex. 259)

[Dkt No. 143-20 at 1-3]

With respect to the Perock Patent, [Doc. No. 143-18], the patentee stated that the "present invention recites a generally rigid continuous sidewall having a generally flat sidewall section and an inwardly flexible panel within the generally flat sidewall section. Perock shows both an outwardly curved movable section and outwardly extending section having multiple corners. Neither of the Perock moveable section is a generally flat surface . . . . Therefore, Perock could not suggest the present invention to one skilled in the art." [Doc. No. 143-5 at 87-88].

With respect to the Bertone Patent, [Doc. No. 143-19], the patentee stated that "Bertone shows a container . . . having a collapsible spout which may be folded outwardly or folded inwardly to close the container. Claim 34 calls for a generally flat inwardly flexible panel forming a portion of said flat panel sidewall section. Bertone does not present a generally flat inwardly flexible panel." [Doc. No. 143-5 at 88]. In summary, in his response to the double patenting rejection the patentee distinguished the new claims from twelve different prior art patents by emphasizing the "generally flat" limitation, and how the prior art generally only had a single cylindrical shape.

Despite the claim amendments in response to the double patenting rejection, the USPTO continued to object to the application and on May 14, 2010, issued a Final Rejection. The examiner found that the claims were anticipated by the Seki Patent and obvious in view of Seki and other prior art patents. *Id.* at 103-108. In response to this Final Rejection, the patentee submitted a Request for Reconsideration. *Id.* at 113-119. In that Request for Reconsideration the patentee emphasized the "generally flat" limitations to overcome the Final Rejection. The patentee stated that "independent claims 34 and 35 recite a continuous sidewall having a portion thereof that defines a ***generally flat sidewall section***. Both claims 34 and 35 define an inward space bounded by the continuous sidewall. Claim 34 also requires a ***generally flat flexible panel*** forming a portion

of the ***generally flat sidewall section***. Independent claim 35 requires an ***inwardly flexible panel*** forming a portion of the ***generally flat sidewall section***." *Id.* at 117 (emphasis in original). As illustrated below, the prior art Seki cup has a single cylindrical shape, and does not have a section of the sidewall that is generally flat and differs in its shape as compared to the remainder of the cylindrical shape.



[Doc. No. 143-12 at 2]. The Patent Office did not accept the patentee's argument in his Request for Reconsideration, and the patentee filed an Appeal Brief before the USPTO Board of Patent Appeals and Interferences. [Doc. No. 143-5 at 128-146]. In that brief, the patentee argued that Seki does not disclose the claimed flat side wall section of claims 34 and 35 and does not teach the generally flat inwardly flexible panel recited in claim 34. *Id*. at 137-138. In response to the Appeal Brief, the USPTO reopened prosecution and issued a new rejection on the basis of the Glintz Patent [Doc. No. 143-21]. The patentee did not respond in a timely manner to the new rejection, and the application went abandoned on June 22, 2011. [Doc. No. 143-5 at 162-163].

On December 6, 2011, the patentee filed a Petition for Revival, along with a Request for Reconsideration. *Id.* at 164, 174-180. In the Request for Reconsideration, the patentee argued that claims 34 and 35 were distinguished from the Glintz Patent based on "a combination of four

features not found in Glintz: (1) a generally **rigid** continuous **sidewall**; combined with (2) "a generally **flat sidewall section**" of said generally continuous sidewall; combined with (3) a generally flat **inwardly flexible panel forming a portion of said generally flat sidewall section**; and combined with (4) fluid-holding." *Id*. at 175 (emphasis in original). Once again, the patentee relied expressly on the "generally flat" limitation and how it differs in its shape as compared to the remainder of cylindrical shape to overcome the prior art. The USPTO granted the Petition for Revival, but continued to reject the claims on the basis of the Glintz Patent and made the rejection Final. *Id*. at 187.

In response to the Final Rejection, the patentee submitted amendments to the claims and for the first time added a "handle" limitation. Specifically, claim 34 was amended to add "a handle located on the non-flexible portion opposite the flexible panel to allow a user to lift and pour the container when filled with liquid," and claim 35 was amended to add "a handle joined to the non-flexible portion opposite the flexible portion to provide for lifting and pouring of the contents of the container by a user," *Id*. at 198-199. The "generally flat" limitations were unchanged and, in the Remarks accompanying the amendments, the patentee once again emphasized "a flat outer surface" to distinguish the claims from the Glintz Patent. *Id*. at 209. The patentee also distinguished the Perock Patent stating that it "certainly does not teach a flat pliable surface." *Id*. at 210. The examiner found these claim amendments and arguments persuasive, and a Notice of Allowance was issued on September 30, 2013. Subsequently, the '178 Patent issued on January 28, 2014, with all claims requiring the "generally flat" limitations and the "handle" limitations.

As discussed above, the context of the surrounding claim language for the "generally flat" limitations indicates that this sidewall section differs in its shape as compared to the remainder of the continuous sidewall. Having amended the claims to add these limitations, and then having

argued repeatedly that those limitations distinguished the claims from the prior art, the patentee cannot now ignore those limitations. *Vitronics Corp. v. Conceptronic,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[The prosecution] history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims."). The Court finds that, when the prosecution history is considered in its entirety, the patentee clearly and unambiguously defined a "generally flat" section to mean a section of the sidewall that is not perfectly flat and differs in its shape as compared to the remainder of the continuous sidewall. *Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.")

In summary, the claim language, the specification and the prosecution history all consistently indicate that the term "generally flat sidewall section" should be construed to mean "a section of the sidewall that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall," and that the term "generally flat inwardly flexible panel" should be construed to mean "a portion of the flat sidewall section that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall."

### iii. Parties' Constructions

Turning to the parties' constructions, the Court generally finds that the parties' constructions are unhelpful and fail to consider the intrinsic record in its entirety. The "generally flat" limitation was explicitly added to avoid the double patenting rejection and distinguish the claims from the prior art. As discussed above, the prior art included rounded or cylindrical containers. The amended claims require the recited "sidewall section" is different in its shape as compared to the remainder of the continuous sidewall. This is in contrast to the cylindrical

containers disclosed in the identified prior art. *Autogiro Co. of America v. United States*, 181 Ct. Cl. 55, 65, 384 F.2d 391, 399 (Ct. Cl. 1967) ("In its broader use as source material, the prior art cited in the file wrapper gives clues as to what the claims do not cover."). The patentee accomplished this distinction by reciting that the sidewall section is "generally flat" as compared to the remainder of the continuous sidewall. Neither Plaintiffs' nor Defendants' construction accurately captures this requirement.

Regarding Defendants' construction, the Court rejects it because it renders the adverb "generally" meaningless. Defendants agree that the term "generally flat" does not require "perfect flatness." However, Defendants propose a construction that excludes everything that is not perfectly flat. For example, Defendants argue that the term "generally flat" cannot be "construed to cover a curved, cylindrical, or rounded surface," and that the ordinary meaning of "generally flat" is "mostly flat and not curved." [Doc. No. 223 at 2].

The Federal Circuit has rejected construing "generally flat" to mean "mostly horizontal," or in this case, "mostly flat," as Defendants propose. In *Schoell*, the Federal Circuit held that construing "generally flat" as "mostly horizontal" provides little guidance. 247 F. 3d at 1208. Despite the admonishment, the Court in *Schoell* did not provide a construction for the term "generally flat," but instead looked to the surrounding claim language to conclude that the accused device did not infringe. *Id.* ("For our purposes, we need not decide whether a shallow V-shaped keel can meet the 'generally flat' claim limitation, or, if so, how shallow it must be."). Accordingly, consistent with *Schoell*, the Court finds that construing "generally flat" to mean "mostly flat" provides "little more guidance than 'generally flat'." *Id.*

The Court also rejects Defendants' construction because a surface that does not have any curvature, arc, bend or bow, would necessarily be considered perfectly straight and flat. This

would be inconsistent with using the adverb "generally" to modify "flat." Simply stated, that which is not "perfectly flat" must be curved, to some extent. Moreover, Defendants' construction is inconsistent with the intrinsic evidence and would exclude preferred embodiments. *Rambus Inc. v. Rea*, 731 F.3d 1248, 1253 (Fed. Cir. 2013) ("A claim construction that excludes the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'"). For example, Figure 2 illustrates that the "generally flat" sidewall segment (24) is not perfectly flat, but may include some curvature, arc, bend or bow.



'178 Patent at Figure 2. Accordingly, the Court rejects Defendants' construction.

Regarding Plaintiffs' construction, Plaintiffs contend that the Court need only rely upon the claims and the specification of the '178 Patent without recourse to the prosecution history. [Doc. No. 170 at 10]. The Court disagrees. It is well settled that the Court should consider the prosecution history as a significant source of evidence. As indicated above, the record before the USPTO is of "critical significance in determining the meaning of the claims." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). Plaintiffs contend that the patentee did not add the "generally flat" sidewall section limitation to the application in order to overcome any

prior art "round" or "cylindrical" references.  Contrary to Plaintiffs' contention, however, the patentee argued how the added limitation of "generally flat" was not found in the prior art round pitchers in responding to the double patenting rejection.

Plaintiffs further contend that none of the remarks were made to distinguish any sidewall section or panel portion because it was in any way curved, bowed or bent. [Doc. No. 170 at 11]. The Court agrees that the prosecution history does not require the "sidewall section" and the "inwardly flexible panel" to be perfectly flat.  However, as discussed above, the claim language, the specification, and the prosecution history indicate that the recited "generally flat sidewall section" must differs in its shape as compared to the remainder of the continuous sidewall.  Indeed, in its Motion for Summary Judgment on Patent Validity, Plaintiffs provide annotated Figures 1-4, and argue that the "shape of continuous sidewall does not 'follow the curvature' of the sidewall forming the sides and back of the product, but instead comprises a 'mostly flat' sidewall 'section' located at the front face of the container."



shape of continuous sidewall does not "follow the curvature" of the sidewall forming the sides and back of the product, but instead comprises a "mostly flat" sidewall "section" located at the front or face of the container

Fig. 1.

Fig. 2.

Fig. 4.

Fig. 5

phantom line showing that front sidewall section is "mostly flat"

[Doc. No. 180 at 18 (highlight added)].

Finally, like Defendants, Plaintiffs' construction requires "generally flat" to mean "mostly flat." [Doc. No. 224 at 1]. As discussed above, the Federal Circuit has rejected construing "generally flat" to mean "mostly horizontal," or in this case, "mostly flat." In *Schoell*, the Federal Circuit held that construing "generally flat" as "mostly horizontal" provides little guidance. 247 F.3d at 1208. Accordingly, the Court finds that the term "generally flat sidewall section" should be construed to mean "a section of the sidewall that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall." The Court further finds that the term "generally flat inwardly flexible panel" should be construed to mean "a portion of the flat sidewall section that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall." Finally, in reaching its conclusion, the Court has considered the extrinsic

evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The Court construes the term **"generally flat sidewall section"** to mean **"a section of the sidewall that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall."** The Court construes the term **"generally flat inwardly flexible panel"** to mean **"a portion of the flat sidewall section that is not perfectly flat, and differs in its shape as compared to the remainder of the continuous sidewall."**

### 3. "handle located on the non flexible portion" and "handle joined to the non flexible portion"

| Disputed Term | Plaintiffs' Proposal[8] | Defendants' Proposal[9] |
|---|---|---|
| "handle located on" | "handle" means "the part of a device that is designed or made to be grasped or held by the hand"<br><br>"located on" means "is a part of" | "handle attached" |
| "handle joined to" | "handle" means "the part of a device that is designed or made to be grasped or held by the hand"<br><br>"joined to" means "attached to, whether by separate manufacture and subsequent connection or by unitary construction or molding as an integrated unit." | "handle attached" |

### a) The Parties' Positions

The parties dispute how the "handle" is "located on" or "joined to" the non-flexible portion.

Plaintiffs argue that the word "handle" is not a technical or confusing word. [Doc. No. 170 at 13].

---

[8] Doc. No. 224 at 1-2.
[9] Doc. No. 223 at 2.

According to Plaintiffs, a "handle" is the part of a device or thing that is designed or made specifically to be grasped or held by the hand. *Id.* (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, Tenth Edition (2002); *Stant Mfg, Inc. v. Gerdes GmbH*, No. 1:02-CV-01653 RLY WT, 2004 WL 3315375, at *22 (S.D. Ind. Sept. 27, 2004)). Plaintiffs argue that the "handle" need only be located on or joined to the continuous sidewall. *Id.* Plaintiffs further argue that to read claims 1 and 6 otherwise would "import[] the limitation 'separate'" into the terms. *Id.* (citing *Amax, Inc. v. ACCO Brands Corp.*, 282 F.Supp.3d 432, 436, 437, 442 (D. Mass. 2017)).

Defendants respond that the claims require that the handle be "located on" or "joined to" the non-flexible portion. [Doc. No. 143 at 4]. What Plaintiffs point to as the handle on the accused device is, according to Defendants, a small chamber for holding rinse water that is an integral part of the continuous sidewall of the container. *Id.* at 4, 6. Defendants thus argue that the small chamber does not meet the handle limitation because it is neither "located on" nor "joined to" the non-flexible portion of the container but is part of a fully integrated container. *Id.* at 4, 6. Defendants further argue that, if the small chamber of the Accused Device is the handle, then the requirement that the container has a generally continuous sidewall is missing. *Id.*

Defendants also argue that the "handle" limitation was added to overcome USPTO rejections and the prior art. *Id.* at 5. Defendants argue that the "handle" limitation does not extend to the integrated liquid holding chamber that is neither "located on" nor "joined to" the non-flexible portion of the container. *Id.* Defendants contend that all of the embodiments shown in the applications leading to the '178 Patent show a conventional handle located on or joined to the sidewall opposite to the flexible panel. *Id.* at 14. Defendants argue that each of the handle embodiments shows a solid separation between the handle and the sidewall to which it is either handle located on or joined to. *Id.* Defendants also argue that the small chamber in the Accused

Device is part of the continuous sidewall and is necessary for "defining an inward fluid holding space." *Id.* According to Defendants, there is no reasonable interpretation of the handle limitation that reads on the Accused Device. *Id.* Defendants repeat that a handle "located on" or "joined to" cannot read on container with no handle. *Id.* at 20. According to Defendants, the "handle" limitation has specific requirements for its location, and must be either "located on" or "joined to" the non-flexible portion of the sidewall. *Id.* at 26.

### b) Analysis

The phrase "handle located on the non flexible portion" appears in claim 1 of the '178 Patent. The phrase "handle joined to the non flexible portion" appears in claim 6 of the '178 Patent. The Court finds that the phrases are used consistently in the claims and are intended to have the same general meaning in each claim. The Court further finds that the parties have not presented a fundamental dispute regarding the scope of a claim term, but instead are arguing an application of a claim term to an accused product. *See, e.g., Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (deciding that the disputed issue was the proper application of a claim term to an accused process rather the scope of the term).

In their briefing, Defendants do not propose a construction for the terms "handle," "located on," or "joined to."[10] Instead, Defendants consistently argue that *the accused product* is missing the handle limitation. Because Defendants have not presented or articulated a fundamental dispute regarding the scope of a claim term, the Court finds that the term "handle" is unambiguous, is easily understandable by a jury, and should be given its plain and ordinary meaning. *O2 Micro*

---

[10] It was not until after the Claim Construction Hearing that Defendants proposed construing "located on" and "joined to" to mean "attached." [Doc. No. 223 at 2].

*Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We, however, recognize that district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *see also, U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (Claim construction "is not an obligatory exercise in redundancy."). Likewise, the terms "located on" and "joined to" are unambiguous, are easily understandable by a jury, and should be given their plain and ordinary meaning.

Contrary to Defendants' arguments, the Court finds that the intrinsic evidence does not require a "conventional handle," or preclude the handle from including a chamber to hold rinse water. Indeed, Defendants concede that "[h]andles are not a new concept and generally alone do not make an invention patentable." *Id.* at 25.

The Court agrees that the "handle" limitation was added during prosecution in response to a Final Rejection. Specifically, claim 34 (issued claim 1) was amended to add "a handle located on the non-flexible portion opposite the flexible panel to allow a user to lift and pour the container when filled with liquid," and claim 35 (issued claim 6) was amended to add "a handle joined to the non-flexible portion opposite the flexible portion to provide for lifting and pouring of the contents of the container by a user." [Doc. No. 143-5 at 197-198]. Mirroring the claim language, the patentee argued that "[t]he non-flexible side wall allows a user to pick up the container with the handle, as the non-flexible sidewall allows the container to be self supported both to hold the liquid therein and to not collapse around the handle due to the weight of the liquid." *Id.* at 208. The patentee further argued "[the prior art] would not work with a handle nor is it likely to be raisable when raised full of liquid, as it is overall too pliable to be self supporting in such a situation." *Id.* at 209. The patentee concluded that "[a]pplicant has resolved this issue by making only a portion of the container flexible and the remainder non flexible to support both the liquid

and be able to be raised by the handle without collapse." *Id.*

Contrary to Defendants' contention, this is not a "clear and unmistakable" disclaimer of a handle that includes a chamber for water. *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d. 1298, 1306-1307 (Fed.Cir.2003). Instead, it simply confirms what the plain language of the claims recite that the handle is located on or joined to the non-flexible portion and is used for lifting and pouring of the contents of the container.

Regarding Defendants' argument that "[n]o embodiment of the handle is shown as a separate chamber to hold rinse water," the Court rejects the contention that claims are limited to only the disclosed embodiments. [Doc. No. 143 at 14]. It is well established that an inventor need not "embrace in the claims or describe in the specifications all possible forms in which the claimed principle may be reduced to practice." *Smith v. Snow*, 294 U.S. 1, 11 (1935); *Nazomi Comm., Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed.Cir.2005) (claims may embrace a "different subject matter than is illustrated in the specific embodiments in the specification"). Indeed, "the mere fact that the specification drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration." *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d. 1298, 1306-07 (Fed. Cir. 2003).

Regarding the terms "located on" and "joined to," the parties do not provide constructions for these terms in their briefing. It was only after the Claim Construction Hearing that Plaintiffs proposed construing the term "located on" to mean "is part of," and the term "joined to" to mean "attached to, whether by separate manufacture and subsequent connection or by unitary construction or molding as an integrated unit." Similarly, it was only after the Claim Construction Hearing that Defendants proposed construing the terms "located on" and "joined to" to mean "attached." The Court finds that the terms "located on" and "joined to" are unambiguous, are

easily understandable by a jury, and should be given their plain and ordinary meaning.

The only discussion of the recited handle in the specification states that "[f]or further convenience, and depending on the size of container (10), a handle (22) can be attached to side wall (12) to assist in manipulation of container (10)." '178 Patent at 4:26–29. The specification further indicates that the claimed container "can be formed of rubber or plastic or metal or wood or any material which will serve to hold a fluid within continuous side wall (12)." *Id.* at 4:9–12. The specification further discloses that in one embodiment "flexible panel (28) as being directly *connected or molded onto* container sidewall (12) with the upper edge (52) of flexible panel (28) providing the flexible rim segment (24) of the sidewall rim (20) of sidewall (12)." *Id.* at 7:59–61 (emphasis added).

Given this disclosure, a person of ordinary skill in the art would understand that the recited container and its subparts may be a single molded piece. Thus, a person of ordinary skill in the art would understand that a handle "located on" or "joined to" the non flexible portion can be formed, molded, connected, or otherwise attached to the non flexible portion. There is nothing in the intrinsic evidence that requires the recited handle to be a "conventional handle," or precludes the handle from including a chamber to hold a fluid. Instead, the plain language of the claim only requires the recited handle "to allow a user to lift and pour the container when filled with liquid," or "to provide for lifting and pouring of the contents of the container by a user." '178 Patent at 8:40–43, 9:7-9. To the extent that Defendants contend that the "handle" must be "attached," so that there is a solid separation between the handle and the sidewall, the Court rejects that argument. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

The phrases **"handle located on the non flexible portion"** and **"handle joined to the non flexible portion"** will be given their plain and ordinary meaning.

### V.    CONCLUSION

The Court adopts the above constructions.  The parties are ordered not to refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury.  However, the parties are reminded that the testimony of any witness is bound by the Court's reasoning in this order but any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**Monroe, Louisiana,** this 15th day of May, 2019.

TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE