UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **MICHAEL L. McGINLEY, ET AL.** | **CASE NO. 3:17-CV-00821 LEAD** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LUV N' CARE, LTD., ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

### SECOND MEMORANDUM OPINION AND ORDER ON CLAIM CONSTRUCTION

On February 24, 2023, the Court granted in part Defendants' motion for a Claim Construction Hearing (Doc. No. 388)[1] to determine the proper construction of two additional claim terms in United States Patent No. 8,636,178 ("the '178 Patent"). Having considered the arguments in the parties' briefing (Doc. Nos. 406, 417, 423), having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Second Claim Construction Memorandum and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] The Court's Order stated that it would consider the claim construction briefing and then determine if a hearing is necessary. [Doc. No. 388 at 3]. The Court has considered the briefing and determines that a *Markman* hearing is unnecessary.

## TABLE OF CONTENTS

I. BACKGROUND ................................................................................................................ 3

II. APPLICABLE LAW ......................................................................................................... 5

III. LEVEL OF ORDINARY SKILL IN THE ART ............................................................... 9

IV. CONSTRUCTION OF DISPUTED TERMS .................................................................. 10

        1. "flexible panel" .................................................................................................. 10

        2. "generally smooth inward surface for unobstructed fluid flow" .................. 11

V. CONCLUSION ................................................................................................................ 19

## I. BACKGROUND

The '178 Patent was filed on October 22, 2008, issued on January 28, 2014, and is directed to a container or pitcher "having a flexible side wall portion and rim portion . . . which can conform to the shape of an object." '178 Patent at Abstract. The specification indicates that the primary purpose of the container is for rinsing shampoo or soap from the head of a child. *Id.* at 2:57–63. Figures 3 and 6 illustrates different embodiments of the container with and without divider 40.



*Id.* at Figs. 3 & 6. The specification states that the container has continuous sidewalls 12 with one of the sidewalls having a sidewall portion 24 with a flexible panel portion 28. *Id.* at 4:4–61. The specification further states that the flexible panel portion is constructed of a thin flexible plastic or a flexible rubber panel that is capable of conforming to the shape of the head of a child. *Id.* at 4:43–61. In operation, the flexible panel portion is pressed against the front of the head above the eyes and the rinse water pours over the top of the head. *Id.* at 2:57–63. The specification indicates that the flexible panel portion prevents the rinse water from flowing into the child's eyes or face. *Id.*

As illustrated above, the specification discloses embodiments of the container without a

divider (Figure 3) and with a divider (Figure 6). *Id.* at 3:29–34, 3:42–46, Figs. 3 & 6. The specification states that the divider is provided so that the rinse water flows over the head more evenly. *Id.* at 7:11–18. Figure 9 illustrates an embodiment having a sidewall section that is shown to be flat with a flat flexible panel 28 flexed slightly inward.



*Id.* at Fig. 9. As illustrated in Figure 9, this embodiment also includes "a generally curved divider panel 50 which separates container 10 into two fluid holding compartments." *Id.* at 6:58–59. The specification discloses that "that the curvature of panel 50 thereby directs the fluid contained in second compartment 44 generally onto the center of the head of the child and avoids even distribution of the water across the width of curved divider panel 50 as the water is being poured out of second compartment 44." *Id.* at 7:6–12.

Claim 1 of the '178 Patent recite the following elements (disputed terms for this Order in italics):

> 1. A container comprising:
> a generally continuous sidewall terminating in an upper sidewall end and a lower sidewall end and defining an inward fluid holding space bounded by said continuous sidewall, said continuous sidewall having a flexible portion thereof that

> > defines a generally flat sidewall section and a generally non flexible portion joined on either end to the flexible portion,
> 
> a bottom closing said lower sidewall end with said upper sidewall generally flat sidewall section end being generally open,
> 
> > a generally flat inwardly *flexible panel* forming a portion of said generally flat sidewall section and extending to form at least a portion of said upper sidewall end, the *flexible panel* facing outwardly and being sized, shaped and sufficiently pliable to matingly mold to the head of a person during use; said *flexible panel* having a *generally smooth inward surface for unobstructed fluid flow* out of said open upper sidewall end, and
> 
> a handle located on the non flexible portion opposite the *flexible panel* to allow a user to lift and pour the container when filled with liquid.

## II. APPLICABLE LAW

### A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption

that claim terms carry their accustomed meaning in the relevant community at the relevant time.")  (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if

it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

### B. Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013); *see also Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("When the prosecution history is used solely to support a conclusion of patentee disclaimer, the standard for justifying the conclusion is a high one.").

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

### III.   LEVEL OF ORDINARY SKILL IN THE ART

The Court previously determined that a person of ordinary skill in the art would have either:

(1) a Bachelor's degree in Mechanical Engineering or equivalent thereof, and at least two years of experience designing consumer products, or (2) familiarity with plastic, rubber, foam and other flexible materials, and at least five years of experience designing consumer products. [Doc. Nos. 233 at 8-10; 234 at 1][3].

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of two terms/phrases of the '178 Patent.

### 1. "flexible panel"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "flexible panel" | Plain and ordinary or, alternatively, "a bendable or pliable portion of the sidewall that conforms to the shape of a forehead during use" | Plain and ordinary meaning. |

#### a) Analysis

The parties originally contended that the meaning of the term "flexible panel" was disputed. Plaintiffs argued that "Defendants cannot credibly argue that the term 'flexible panel' should be given any technical or restricted meaning." [Doc. No. 406 at 7]. Defendants responded that they now agree that the term "flexible panel" should be given its plain and ordinary meaning. [Doc. No. 417 at 2]. Thus, the parties agree that there is not a fundamental dispute regarding the scope of the claim term "flexible panel." *See O2 Micro Int'l v. Beyond Innovation Tech.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Accordingly, the term "flexible panel" will be given its plain and ordinary meaning.

---

[3] Citations are to the filing's number in the docket [Doc. No.] and pin cites are to the page numbers assigned through ECF.

### b) Court's Construction

The term **"flexible panel"** is given its **plain and ordinary meaning**.

### 2. "generally smooth inward surface for unobstructed fluid flow"

| Disputed Term | Plaintiffs' Proposal[4] | Defendants' Proposal[5] |
|---|---|---|
| "generally smooth inward surface for unobstructed fluid flow" | Plain and ordinary or, alternatively, "a surface that does not obstruct, block or constrict the flow of fluid from the container's upper sidewall end during use" | "mostly smooth inward surface devoid of corrugations, ridges, or ribs extending the width and depth of the inner surface of the flexible panel" |

### a) Analysis

To begin the analysis, the Court first turns to the language of the claims, as it provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1313 (citing *Vitronics Corp.*, 90 F.3d at 1582). The phrase "generally smooth inward surface for unobstructed fluid flow" appears in claims 1 and 6 of the '178 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

Claims 1 and 6 recite that the "inward surface" of the flexible panel must be "generally smooth." The claims further recite that the surface allows "for unobstructed fluid flow" out of the container. In other words, the "inward surface" of the flexible panel must be "generally smooth" such that the fluid is not "obstructed" as it flows out of the container. Figure 7 illustrates an example of fluid flowing out of a container unobstructed.

---

[4] Doc. No. 224 at 1.
[5] Doc. No. 223 at 2.



'178 Patent at Figure 7.

Regarding the term "generally smooth" in the disputed phrase, the Court finds that it should be construed to mean "mostly smooth." The term "generally" is recited multiple times in the claims, and the Court presumes that "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). The Federal Circuit recently determined that "generally" in the context of the '178 Patent should be construed to mean "mostly." Specifically, the Federal Circuit construed the term "*generally* flat" to mean "*mostly* flat and not, as a whole, V-shaped, round, or cylindrical." [Doc. No. 258 at 13] (emphasis added).

The Court further finds that the prosecution history of related U.S. Patent No. 7,441,675

("the '675 Patent") is relevant intrinsic evidence that informs the meaning of the disputed phrase.[6] *See Phillips,* 415 F.3d at 1317 (the prosecution history "can often inform the meaning of the claim language by demonstrating…whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."). During prosecution of the '675 Patent, the examiner rejected pending claims 1 and 7 for anticipation (35 U.S.C. § 102(b)) based on the prior art Perock Patent (U.S. Patent 4,756,439). The Perock Patent disclosed a "container having a flexible panel area 17 that is designed to [be] flexible and is covering at least a portion of the side panel." [Doc. No. 417-2 at 5].

---

[6] The Court previously summarized the relationship of the '675 Patent to the '178 Patent as follows:

> The '178 Patent was based on a continuation-in-part ("CIP") application Serial No. 12/255,797 ("the '178 Application"), filed on October 22, 2008. [Doc. No. 136-11]. The '178 Application was a CIP of Application Serial No. 10/770,325 ("the '675 Application") filed on February 2, 2004. [Doc. No. 136-22]. The '675 Application issued as United States Patent No. 7,441,675 (the '675 Patent) with all claims directed to a flexible panel pitcher or container with a divider. The '675 Application was a CIP of Application Serial No. 10/357,651 filed on February 4, 2003 ("the Original Application"). [Doc. No. 158-6]. After the '675 Application was filed and assigned a serial number, the patentee abandoned the Original Application. [Doc. 158-6 at 48].

[Doc. No. 235 at 2].



[Doc. No. 406-6 at Figure 1]. As shown in Fig. 1 of the Perock Patent, the inner surface of the flexible panel area 17 includes a series of corrugations (23).[7]

The examiner equated the recited "flexible panel" with the corrugated sidewall and multi-sided spout of the "integral washboard" disclosed by the Perock Patent. [Doc. No. 417-2 at 5] ("Perock shows a container having a flexible panel area 17 that it is designed to [be] flexible and is covering at least a portion of the side panel."). In response to the rejection, the patentee amended claims 1 and 7 to recite that the "flexible panel" had "a generally smooth inward surface for unobstructed fluid flow," as shown below:

> 1. (Currently Amended) A container comprising:
> a continuous side wall terminating in an upper side wall end and a lower side wall end <u>and defining an inward space bounded by said continuous sidewall</u>,
> a bottom closing said lower side wall end, and
> a <u>an inwardly</u> flexible panel forming a portion of said side wall and extending to form at least a portion of said upper side wall end<u>, said flexible panel having a generally smooth inward surface for unobstructed fluid flow.</u>

---

[7] The Perock Patent further states that in a preferred embodiment "[t]he corrugations are continuous for the whole width and depth of wall 17." [Doc. No. 406-6 at 2:13–15].

Page 14 of 20

> 7. (Currently Amended) A container comprising:
> a continuous side wall having an upper side wall end and a lower side wall end <u>and defining an inward space bounded by said continuous sidewall</u>,
> a bottom attached to said lower side wall end, ~~and~~
> a rim connected to said upper side wall end,
> a portion of said rim being sufficiently <u>inwardly</u> flexible to conform to the shape of an object to which said rim is pressed ~~against.~~ <u>against, and</u>
> <u>an inwardly flexible panel forming a portion of said side wall and connecting with said inwardly flexible rim portion, ==said inwardly flexible panel having a generally smooth inward surface for unobstructed fluid flow.==</u>

[Doc. No. 417-3 at 5,6] (highlight added).[8] Regarding the claim amendments, the patentee argued as follows:

---

[8] The claim amendments are depicted by the underlined text and highlight.

Page 15 of 20

> Rejection of claims 1, 2, 4, 6-8, 10, 12-14, 16, 18-20 and 22-24 under 35 U.S.C. § 102(b) as being anticipated by Perock.
>
> The device of Perock is a container having an integral washboard; the washboard portion being designed to flex outwardly so as to capture the object for scrubbing within the sides 24, 25 and 26 of the Perock device. The Applicant has amended independent claims 1, 7 and 20 to recite "an inwardly flexible panel" and that the inwardly flexible panel is provided with "a smooth inward surface for unobstructed fluid flow."
>
> By contrast, the Perock device is specifically intended for a single purpose – that of scrubbing an article to be cleaned. To this end of providing scrubbing action, the Perock washboard 16 having spout 12 and mouth 24 is specifically intended to flex outwardly when pressed upon from the inside of the Perock device. (See, Col. 2, Lines 25-28 and Col. 2, Lines 66-Col. 3, Lines 1-3.) Therefore, the Perock device is not provided with an inwardly flexible panel and the Perock device would not operate to function as does the present invention were an attempt made to force the Perock panel or washboard 16 to flex inwardly.
>
> Were such inward flexing attempted with the Perock device, improper mating with the object pressed against the Perock device would occur and the fluid being poured from the Perock container would spill over the entire width of the sidewall of Perock containing washboard 16 including water moving over portions of rim 27 adjacent to washboard 16. This would be contrary to the function of the present invention which is to provide close mating of the flexible panel of the present invention with the forehead of a child.
>
> In addition, independent claims 1, 7 and 20 now specify that the flexible panel has "a generally smooth inward surface for unobstructed fluid flow." The device of Perock is provided with a washboard 16 having corrugations 23 on wall 17 which would obstruct the flow of fluid out of the container being used to provide moderated flow of rinse water to a child's head.
>
> As the patent to Perock does not contain the structural limitations now set forth particularly in claims 1, 7 and 20, the Applicant believes that these independent claims are not anticipated by the patent to Perock, and that the rejection of independent claims 1, 7 and 20 may be withdrawn, and that claims 2-6 and 8, 10, 11 and 12 and 22-24 which depend from these now allowable independent claims also may be withdrawn.

[Doc. No. 417-3 at 12-13]. As indicated, the patentee distinguished the Perock Patent by arguing that it did not disclose "an inwardly flexible panel," and did not disclose "a generally smooth

Page 16 of 20

inward surface for unobstructed fluid flow." Regarding the "generally smooth inward surface for unobstructed fluid flow," the patentee argued that the "device of Perock is provided with a washboard 16 having corrugations 23 on wall 17 which would obstruct the flow of fluid out of the container being used to provide moderated flow of rinse water to a child's head." *Id.* at 12. Thus, the patentee clearly and unmistakably disclaimed an inward surface that includes corrugations that obstruct the flow of fluid out of the container. *See, e.g.*, *Anchor Wall Sys. v. Rockwood Retaining Walls*, 340 F.3d 1298, 1307 (Fed. Cir. 2003) ("During prosecution, an inventor may surrender coverage of material that would otherwise be covered by a claim; however, the surrender must be clear and unmistakable."). Indeed, the patentee explicitly argued that "Perock does not contain the structural limitations now set forth particularly in claims 1, 7 and 20." *Id.* Accordingly, the Court finds that the phrase "generally smooth inward surface for unobstructed fluid flow" should be construed to mean "mostly smooth inward surface that does not include corrugations that obstruct fluid flow."

Turning to the parties' constructions, Plaintiffs contend that the phrase should be given it plain and ordinary meaning. In the alternative, Plaintiffs argue that the phrase should be construed to mean "a surface that does not obstruct, block or constrict the flow of fluid from the container's upper sidewall end during use." Given the prosecution history, the phrase cannot be given its "plain and ordinary" meaning, because the patentee disclaimed certain "structural limitations." As discussed, the patentee's narrowing claim amendment and accompanying statements to avoid the Perock Patent indicates that he disavowed coverage of a flexible panel incorporating corrugations that obstruct the flow of fluid. Therefore, adopting Plaintiffs' construction could allow them to recapture this disavowed claim scope.

Plaintiffs' construction also impermissibly reads "generally smooth" out of the claim or

renders it superfluous with "unobstructed fluid flow." The patentee clearly and unmistakably identified the corrugations disclosed in the Perock Patent as falling outside the scope of the claims. Accordingly, the Court rejects Plaintiffs' proposals.

Turning to Defendants' construction, Defendants propose construing the phrase to mean "mostly smooth inward surface devoid of corrugations, ridges, or ribs extending the width and depth of the inner surface of the flexible panel." As discussed, the Court agrees that the "generally smooth inward surface for unobstructed fluid flow" cannot include "corrugations" that obstruct the flow of fluid out of the container. However, the prosecution history does not mention "ridges or ribs." Instead, the '178 Patent discloses an embodiment having a divider and/or "fluid directing ridges 52 provided on the inside surface of flexible panel 28." '178 Patent at 3:50–52; 7:33–51.



'178 Patent at Figure 8 (highlight added). The specification states that "ridges 52 are, in a preferred embodiment, molded of the same material which flexible panel 28 is constructed … however, it is desirable that ridges 52 do not obstruct the flexibility of panel 28 as it should be readily

shapeable or moldable against the contours of the forehead of a child." *Id.* at 7:38–51. The specification further states that the "ridges 52, in conjunction with the curvature of panel 50, will generally increase the amount of water flow from compartments 42, 44 which is directed towards the center of the head of a child." *Id.* at 7:48–51. This indicates that ridges on the inside surface of the flexible panel do not automatically fall outside the scope of the claims. Instead, it is a material issue of fact of whether a "ridge" is a "corrugation" that obstructs the flow of fluid outside of the container. Likewise, there was no discussion by the patentee about the "corrugations" being "the width and depth of the inner surface of the flexible panel." Accordingly, the Court rejects this wording proposed by Defendants. Finally, in reaching its conclusion, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight considering the intrinsic evidence.

### b) Court's Construction

The Court construes the phrase **"generally smooth inward surface for unobstructed fluid flow"** to mean **"mostly smooth inward surface that does not include corrugations that obstruct fluid flow."**

### V. CONCLUSION

The Court adopts the above constructions. The parties are ordered to not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any part of this opinion, other than the definitions adopted by the Court, in the presence of the jury. However, the parties are reminded that the testimony of any witness is bound by the Court's reasoning in this order but any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

MONROE, LOUISIANA, this 23rd day of June, 2023.

                                                                   Terry A. Doughty
                                                                   United States District Judge